UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 25-80900 |
| PEORIA CHARTER COACH COMPANY | ) | |
| | ) | Chapter 11 |
| Debtor(s) | ) | |
| | ) | [Subchapter V] |

## FIRST AMENDED SUBCHAPTER V PLAN OF REORGANIZATION

NOW COMES Peoria Charter Coach Company ("Debtor" or "Peoria Charter"), and proposes the following First Amended Subchapter V Plan of Reorganization ("Plan") pursuant to 11 U.S.C. §§ 1189 and 1190:

## INTRODUCTION

The Debtor filed its petition under Chapter 11 of the Bankruptcy Code on December 11, 2025 ("Petition Date"),[1] commencing this case ("Case") under Subchapter V of the Bankruptcy Code, 11 U.S.C. §§ 1181-1195 ("Subchapter V"). The Debtor has operated its business and managed its financial affairs as the Debtor-in-Possession. As set forth in Section 1183 of the Bankruptcy Code, Robert E. Eggmann, III has been appointed the Subchapter V Trustee ("Trustee") of this Case. The Debtor is the proponent of this Plan.

## ARTICLE I
## SUMMARY OF THE PLAN

The Plan contemplates payment of Allowed Claims in this Case by the Debtor's payment of Allowed Claims with payments to be received in the five (5) years following the Effective Date of the Plan, and continued payment of Secured Claims as provided for in this Plan beyond the term of the Plan, until such Secured Claims are paid in full.

The Plan provides for one (1) Class of Priority Non-Tax Claims, one (2) Classes of Secured Claims, one (1) Class of Unsecured Claims, and one (1) Class of Allowed Interests. The Plan also provides for the payment of Trustee fees, Administrative Claims and Priority Tax Claims. Creditors should refer to Articles VI and VII of the Plan for information regarding the precise treatment of their Claims.

## ARTICLE II
## DISCLAIMER

This Plan is being provided to all known holders of Claims against the Debtor or its Estate who are entitled to vote their acceptance or rejection of the Plan. This Plan is provided to solicit acceptance of the Plan filed by the Debtor. The Plan provides the information required under Section 1190 of the Bankruptcy Code.

The information set forth in the Plan has been submitted by the Debtor unless specifically identified to be from other sources. No representations concerning the Debtor or the

---

[1] Capitalized terms not defined in the Plan shall have the meaning set forth in Article V of the Plan.

1

Plan, other than as set forth herein, have been authorized by the Debtor. The Debtor believes that all of the information contained in this Plan is accurate; however, the Debtor does not warrant that there are no inaccuracies and specifically disclaims any liability for unintentional errors and inadvertent inaccuracies contained in this Plan.

## ARTICLE III
## VOTING

A holder of a Claim in an Impaired class is entitled to vote to accept or reject the Plan if such Claim has been allowed pursuant to Section 502 of the Bankruptcy Code or temporarily allowed for voting pursuant to Rule 3018 of the Bankruptcy Rules.

If you are entitled to vote to accept or reject the Plan, you will receive a Ballot. You will receive notice of the Ballot and the deadline for when and how the Ballot must be returned in order to be counted. You will also receive a notice for a hearing on confirmation of this Plan and information contained within the Plan, and deadlines for the filing of any objections to the Plan

**YOUR VOTE IS IMPORTANT.** Confirmation of the Plan, and corresponding implementation of the proposed terms of the Plan, may depend upon receipt of a sufficient number of votes in favor of the Plan. If the Debtor receives a sufficient number of votes, the Debtor will seek confirmation of the Plan under Section 1191(a) of the Bankruptcy Code. However, in the event sufficient votes in favor of the Plan are not received, the Debtor will seek to confirm the Plan as permitted under Section 1191(b) of the Bankruptcy Code.

**This Plan sets forth the treatment of each Class of Claims. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one to determine and evaluate your rights under this Plan.**

## ARTICLE IV
## BACKGROUND

4.1     Nature and History of the Business

Peoria Charter Coach Company is an Illinois based motorcoach company that has been operating continuously since 1941. For more than eighty years, the company has provided charter, scheduled, and contract transportation services throughout Central Illinois and the Chicago area.

Peoria Charter has long served the cities of Peoria, Urbana, Champaign, Bloomington, Chicago, and surrounding communities. The company maintains facilities and offices in Urbana, Illinois, with Peoria serving as its headquarters. Peoria Charter also operates a satellite location in Arlington Heights, Illinois, and maintains travel offices in Normal, Illinois.

Each year, Peoria Charter transports more than 400,000 passengers. The company's fleet travels approximately three million miles annually. Peoria Charter provides transportation for a wide range of groups, including universities and athletic teams, business and corporate travelers, private charters, weddings, and other group travel. In addition, the company operates daily scheduled line run service, offering between eight and ten departures per day connecting Peoria, Bloomington, Urbana, Chicago, and Purdue University in Lafayette, Indiana and has become a highly-valued service to the communities.

During the most recent Thanksgiving weekend, Peoria Charter transported more than 8,000 University of Illinois students from Chicago area airports and suburbs back to the Urbana Champaign campus during a snowstorm. The entire staff, including the Chief Executive Officer, was actively involved in supporting the operation to ensure students arrived safely and on time. The company's efforts were recognized by WCIA, which highlighted Peoria Charter as a reliable transportation option during severe weather.

Peoria Charter also regularly provides transportation services under contract for the United States Department of Defense. These contracts require strict safety, compliance, and reliability standards and reflect the company's ability to perform sensitive and mission critical transportation work.

Peoria Charter has a long history of dependable service and strong operational performance. The company continues to carry out large-scale transportation operations during peak demand periods and under challenging conditions.

Peoria Charter has also been recognized within the motorcoach industry for its environmental efforts. In 2023, the company received a United Motorcoach Association award recognizing Peoria Charter as a Green Energy Leader. This award reflected the company's efforts to modernize its fleet, improve fuel efficiency, and reduce environmental impact while continuing to meet the transportation needs of its communities.

In October 2024, Peoria Charter was purchased by a new ownership group consisting of three owners. James Wang is the Chief Executive Officer and a co-owner of the company. Mr. Wang began working at Peoria Charter in 2011 as a part-time driver while completing his education. Over the years, he advanced into management roles and later became Director of Operations. He was appointed Chief Executive Officer in April 2024 and became a co-owner in October 2024 as part of the ownership transition. Since the change in ownership, the company has continued operating without interruption.

4.2     Significant Events Leading to the Chapter 11 Filing

During the COVID-19 pandemic in 2020, the previous owners obtained a federal Main Street Loan under the CARES Act to keep the business operating during shutdowns and severe travel restrictions. At the time, the interest rate was relatively low, but the loan included a variable rate that increased significantly over time.

Although the company consistently made payments and paid down a meaningful portion of the loan, the interest rate later increased from approximately three percent to more than eight percent. This caused the required payments and final balloon payment to grow to a level the business could not reasonably pay without harming normal operations.

After the ownership change in October 2024, the new owners spent the following year trying to resolve the Main Street Loan outside of bankruptcy. These efforts included attempts to refinance the debt through commercial banks and exploring SBA loan options. When the company was purchased, the real estate was not included in the transaction. As a result, the company had limited collateral, primarily consisting of used motorcoaches. Financial institutions were not willing to lend against those assets at levels sufficient to refinance the loan.

Management also sought assistance through government channels. Letters were sent to the Governor's Office and the White House, and discussions were held with local government officials to explore whether any relief or modification options were available related to the Main Street Loan. These efforts did not result in any form of assistance or alternative solution.

After reviewing all available options, including refinancing, out of court solutions, and a potential sale of the company, management determined that none of these options could address the loan while allowing the business to continue operating.

### 4.3      Anticipated Reorganization Plan

The company has continued to operate as a going concern business. Peoria Charter is operating normally, maintains positive cash flow, and continues to pay employees, vendors, and all regular operating expenses.

Other than standard net fifteen and net thirty trade invoices, Peoria Charter does not carry meaningful operating debt. The filing of this case was not caused by unpaid bills, lack of demand, or operational failure. The company had always paid its bills and had never been late or defaulted on any payment up to the time of filing. This has been a point of pride for the company, and vendors and partners value Peoria Charter for its consistency and reliability.

The decision to file under Subchapter V was made to protect the long-term future of Peoria Charter and the people who depend on it, including employees, customers, vendors, and the communities it serves. The Debtor seeks through this case to reorganize pandemic-era debt so to be able to continue to operate profitably and continue to serve its communities through its operation well into the future.

## ARTICLE V
## DEFINITIONS

The following terms used in this Plan shall have the meaning specified below, unless otherwise defined in this Plan.

5.1      **Administrative Claim:**  A cost or expense of administration of this Case, including any actual, necessary expense of preserving or liquidating the Estate, or of operating the business of the Debtor and amount allowed under Section 503(b) of the Bankruptcy Code.

5.2      **Allowed Claim:** A Claim for which (i) proof has been filed with the Court within the time fixed by the Court, and if there are any objections to a Claim filed by any party in interest, that such objection has been resolved or determined by a Final Order, (ii) the Debtor has or afterward amended the schedules in this Case to list such Claim as liquidated in amount and not disputed or contingent in the schedules this Case, (iii) that has been allowed by a Final Order of this Court, or (iv) that is allowed by this Plan.

5.3      **Allowed Interest:** The term Allowed Interest shall have the meaning set forth in Article VII, 7.5 of the Plan.

5.4      **Ballot:**  The form or forms distributed to holders of Claims entitled to vote on the Plan to indicate their acceptance or rejection of the Plan.

4

5.5     **Bankruptcy Code:**  Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., in effect on the Petition Date.

5.6     **Bankruptcy Rules:**  The Federal Rules of Bankruptcy Procedure, as may be amended from time to time.

5.7     **Chapter 11:**  Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 et seq.

5.8     **Claim:**  The term Claim shall have the meaning set forth in Section 101(5) of the Bankruptcy Code, 11 U.S.C. § 101(5).

5.9     **Class:** Class refers to each class of claims designated as Class 1 through 5 as described in Article VII of the Plan.

5.10    **Confirmation:**  The Court's entry of a Final Order confirming the Plan pursuant to the provisions of Subchapter V.

5.11    **Final Confirmation Order:**  Final Order confirming the Plan.

5.12    **Court:**  The United States Bankruptcy Court for the Central District of Illinois.

5.13    **Debtor:**  Peoria Charter Coach Company.

5.14    **Debtor-in-Possession:**  Peoria Charter Coach Company.

5.15    **Effective Date:**  The first day following the date that the Final Confirmation Order becomes a Final Order.

5.16    **Estate:**  All of the Debtor's property of the estate as defined in Section 541 of the Bankruptcy Code, and Section 1186 of the Bankruptcy Code (if applicable).

5.17    **Final Order:**  An order or judgment entered by the Court which has not been reversed, stayed, modified or amended, and for which (a) the time for any appeal or petition for review has expired and no appeal or petition for review is pending or was timely filed, or (b) any appeal or petition for review has been finally determined or dismissed.

5.18    **General Unsecured Claim:** A Claim other than a Secured Claim, an Administrative Claim, a Priority Non-Tax Claim or a Priority Claim.

5.19    **Governmental Unit:**  The term Governmental Unit shall have the meaning set forth in Section 101(27) of the Bankruptcy Code.

5.20    **Impaired:**  The term Impaired shall have the meaning set forth in Article VII of the Plan.

5.21    **Plan:**  This First Amended Subchapter V Plan of Reorganization including any amendments or modifications thereto.

5.22    **Priority Non-Tax Claim:** A Claim that arises under Section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

5.23    **Priority Tax Claim:** A Claim of a Governmental Unit that is entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

5.24    **Pro Rata:**  The proportion that an Allowed Claim in a Class bears to the aggregate amount of all Allowed Claims in such Class.

5.25    **Secured Claim:**  A Claim which is asserted to be based on a security agreement and validly perfected and enforceable lien or security interest, as further defined in Sections 101(37), (50) and (51) of the Bankruptcy Code, in property of the Estate. A Secured Claim shall be limited in amount to the extent determined by Section 506 of the Bankruptcy Code, with the balance of the claim treated as a General Unsecured Claim, except to the extent the holder of such Secured Claim is entitled to and makes the election permitted by Section 1111(b)(2) of the Bankruptcy Code.

5.26    **Unclassified Claims:**  Claims of the kind specified in Sections 507(a)(2), 507(a)(3) or 507(a)(8) of the Bankruptcy Code, which are not classified pursuant to Section 1123(a)(1) of the Bankruptcy Code.

Unless otherwise defined in this Plan, terms used in this Plan shall have the meanings ascribed to them in the Bankruptcy Code and Bankruptcy Rules.

## ARTICLE VI
## UNCLASSIFIED CLAIMS AND TREATMENT UNDER PLAN

Unclassified Claims are automatically entitled to specific treatment under the Bankruptcy Code. Such Claims are not considered Impaired and holders of such Claims do not vote on the Plan, although they may object if in their view their treatment under the Plan does not comply with that required by the Bankruptcy Code.

The following Unclassified Claims exist under the Plan pursuant to Section 1123(a)(1) of the Bankruptcy Code:

6.1    **Administrative Claims:**  Administrative Claims in this Case are expected to consist of Allowed Claims for (i) fees of the Debtor's professionals, (ii) Court costs, (iii) Trustee fees, and (iv) any unpaid post-petition expenses.

Except as expressly provided herein, holders of allowed Administrative Claims will be paid on the Effective Date in cash in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code from available existing cash, unless the holder of an Administrative Claim agrees to a different treatment or the Court orders otherwise. The Debtor reserves the right to pay professionals in deferred payments, if necessary and as permitted under Section 1191 of the Bankruptcy Code.

The Debtor estimates that the following Administrative Claims may be Allowed Claims of professionals in this Case:

| PROFESSIONAL | AMOUNT |
|---|---|
| Debtor's Counsel in this Case | $35,000 |
| Trustee in this Case | $10,000 |
| Debtor's Accountant | $15,000 |

6

These projected amounts are based upon estimated fees in the Case and the presumption that Confirmation or pleadings to be filed in this Case will not be litigated. To the extent this presumption is incorrect, Administrative Claims of professionals will likely increase.

6.2 **Tax Claims:** The Allowed Claims, if any, of any Governmental Unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

Except as expressly provided herein, holders of allowed Tax Claims will be paid in full within thirty (30) days of the Effective Date, unless the holder of allowed a Tax Claim agrees to a different treatment or the Court orders otherwise.

## ARTICLE VII
## CLASSIFIED CLAIMS AND TREATMENT UNDER PLAN

The following are the Classified Claims in this Case, and their proposed treatment under the Plan. Classified Claims in Classes 3 and 4 are Impaired, which means that the Plan alters the legal, equitable, or contractual rights of the members of that Class. The Classified Claims are:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No |
| Class 2 | Morton Community Bank | Unimpaired | No |
| Class 3 | Secured Claim of Dayspring Bank | Impaired | Yes |
| Class 4 | General Unsecured Claims | Impaired | Yes |
| Class 5 | Allowed Interests | Unimpaired | Deemed to Accept |

7.1 **Class 1 – Priority Non-Tax Claims:** Any Priority Non-Tax Claims that are filed and allowed will be paid in full by the time such taxes are known and due, except to the extent that a holder of an allowed Class 1 Claim agrees to less favorable treatment on account of such Claim. Class 1 is not impaired.

7.2 **Class 2 – Secured Claim of Morton Community Bank:** Morton Community Bank ("Morton") filed Claim 11-2 in the amount of $57,245.25 for amounts owed under the Debtor's drivers' credit cards as of the date of filing, which are generally paid on a monthly basis as part of the company's normal operating expense. Morton holds a first priority blanket security interest in assets of the Debtor based on a UCC Financing Statement originally filed on April 16, 2012, and a pledge of $190,000 of a money market account as security for the following items: $150,000 for the commercial credit card program for the Debtor's drivers, and 2 letters of credit totaling $40,000 – 1 for $20,000 required by the Debtor's insurance company RLI to keep their buses insured, and 1 for $20,000 required so their travel agency can continue booking airline tickets for customers. Claim 11-2 shall be treated as an allowed Secured Claim. The Debtor proposes to maintain its contractual agreements with Morton. Class 2 is not impaired and not entitled to vote.

7.3 **Class 3 – Secured Claim of Dayspring Bank:** Dayspring Bank ("Dayspring") filed Claim 9-2 in the amount of $3,154,726.81 for a note dated December 11, 2020. Dayspring holds a second priority blanket security interest in assets of the Debtor based on a UCC Financing Statement originally filed on December 15, 2020 and certain vehicle titles.

7

Claim 9-2 of Dayspring will be treated as a Secured Claim in the amount of $1,628,267.80 to accrue interest at the annual rate of 5.375% until such amount is paid.[2] The Debtor will pay at least $14,527.96 monthly to Dayspring until the Secured Claim of $1,628,267.80 is paid. No fees, charges or interest shall be added to the claim other than as set forth in this Plan, and the Debtor also may prepay such amounts in full or in part. The first payment due within thirty (30) days of the Effective Date. The balance of the allowed amount of the claim shall be treated as a Class 4 General Unsecured Claim.

The Debtor reserves the right to seek further appraisal of property in this case or propose a modified Secured Claim up and until the time of confirmation. Dayspring will retain its liens in any property until it is determined that it is wholly or partially unsecured, and release its liens in such property upon sale of any vehicles (unless the Debtor is behind on payments to Dayspring under this Plan), or upon payment of the allowed amount of its allowed Secured Claim.

Class 3 is impaired and entitled to vote.

7.4     **Class 4 – General Unsecured Claims:** General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under Section 507(a) of the Bankruptcy Code. General Unsecured Claims shall receive Pro Rata payment of their allowed Claims without interest or other charges through Plan distributions in the manner described in Article XV and in the Final Confirmation Order. Class 4 General Unsecured Claims are impaired and entitled to vote.

7.5     **Class 5 – Allowed Interests:** Class 5 consists of all Allowed Interests in the Debtor. Allowed Interests will be retained on the Effective Date and are therefore unimpaired under the Plan. Class 5 is deemed to have accepted the Plan and therefore is not entitled to vote.

**ARTICLE VIII**
**IMPLEMENTATION OF PLAN**

8.1     Exhibit B sets forth the cash flow statement of the Debtor from projected net income to fund the Plan. The Debtor reasonably projects that it has the ability to make all the payments required under the Plan.

8.2     Upon Confirmation, the provisions of the Plan shall bind all creditors thereby preventing any party from foreclosing any lien or security interest in any assets of the Debtor or otherwise enforcing Claims against the Debtor and its assets except in a manner provided for under the terms and conditions of this Plan.

8.3     The Debtor or the Trustee shall have the right to make or cause to make any distribution to creditors earlier than required by the Plan, without penalty.

---

[2] The Secured Claim includes estimated values of personal property and inventory of $70,050, vehicles for which Dayspring holds title of $162,069, accounts receivable of $160,601, bank accounts at Morton of $1,058,335 and an investment account of $408,659. The Secured Claim is reduced by the security held for the Class 2 Claim of Morton in the amount of $190,000 and payments totaling $41,446.20 for February through June that will have been made under the cash collateral order previously entered in this case (Court Doc. 101).

8.4     The terms of this Plan will exclusively govern payments to creditors and any other rights of creditors as against the Debtor and the Estate.

8.5     Attached to this Plan as Exhibit A is the Debtor's Liquidation Analysis setting forth the likely result of liquidation of the Estate if this Case were converted to a proceeding under Chapter 7 of the Bankruptcy Code.

8.6     As appropriate pursuant to 11 U.S.C. § 1191(c)(3)(B), as default remedy for a party with an allowed Claim in this Case, unless otherwise agreed between the Debtor and any such creditor (whether by separate stipulation or agreement), if there is a payment default greater than thirty (30) days, such creditor may issue a written notice of default to the Debtor. A payment default includes any missed payment, partial payment, or lapse of insurance as to the creditor's collateral (if applicable). If the asserted payment default is not cured by the Debtor within fourteen (14) days of such notice by email and U.S. Mail to counsel for the Debtor and Debtor, the automatic stay shall be deemed terminated and the creditor may proceed as may be permitted under state or federal law, with seeking to collect any unpaid amounts under its original Claim as of the date of filing, less post-petition payments made.

## ARTICLE IX
## EXECUTORY CONTRACTS

9.1     The following executory contracts and unexpired leases are assumed through the Plan pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code (or have previously been assumed by prior Final Order of the Court), and the Debtor will continue to perform pursuant to the contractual payments and other provisions of the executory contracts:

(a) 6035 Knoxville, LLC – Lease for rent of office of Peoria Charter Travel at 6035 N. Knoxville Avenue, Suite 101B, Peoria, IL.

(b) ABC Companies – Leases for 2018 Van Hool CX35 motor coach (Bus #226, VIN 9818) and 2024 Van Hool CX45 motor coach (Bus #220, VIN 4245) (Court Doc. 53, 103).

(c) Ascentium Capital – Lease for 2023 Tourrider Mercedes-Benz motor coach (Bus #221, VIN ending 1976) (Court Doc. 56, 106) (Proof of Claim 15-1).

(d) Atlantic Union Equipment Finance – Lease for 2024 MCI 4500 motor coach (Bus #211, VIN ending 7671) (Court Doc. 55, 105).[3]

(e) Atlys Commercial Credit, LLC as authorized rep of MAC Solutions, LLC – Lease for 2020 MCI J4500 motor coach (Bus #280, VIN ending 9695 (Court Doc. 54, 104).

(f) B.C. Winkler Enterprises, LLC – Lease for rent of office at 191 N. Federal Drive, Urbana, IL, garage facility at 2008 N. Federal Drive, Urbana, IL, and portion of buildings at company headquarters of 4600 NE Adams St., Peoria, IL.

(g) Bank of America Leasing & Capital, LLC – Lease for 2023 Mercedes-Benz Tourrider motor coach (Bus #222, VIN ending 1977) (Court Doc. 57, 107).

---

[3] The collateral for Atlantic's lease was inadvertently described as a 2018 MCI 4500 motor coach, but by this Plan the Debtor clarifies that it is a 2024 MCI 4500 motor coach.

(h) College Hills LLC – Lease for rent of office of Peoria Charter Travel at 1503 E. College Avenue, Unit D, Normal, IL.

(i) Customers Commercial Finance, LLC – Lease of 2024 MCI J4500 motor coach (Bus #210, VIN ending 7670) (Court Doc. 58, 108) (Proof of Claim 7-1).

(j) Midland States Bank / North Mill as successor – Lease for 2024 Van Hool CX45 motor coach (Bus #223, VIN 4284) (Court Doc. 60, 110) (Proof of Claim 8-1).

(k) Navitas Credit Corp. – Leases for bus cameras and wireless gear (Proof of Claim 1-1).

(l) Navitas Credit Corp. / LEAF Capital – Lease for GPS units (Proof of Claim 10-1 filed by LEAF Capital as assignee of Navitas).

(m) Navitas Credit Corp. / U.S. Bank Equipment Finance assignee of Navitas– Lease for bus technology equipment.

(n) Old Second National Bank – Lease of 2023 Van Hool CX45 motor coach (Bus #207, VIN ending 4113) (Court Doc. 59, 109).

(o) M&T Bank f/k/a M&T Capital and Leasing Corporation f/k/a People's Capital and Leasing Corp – Lease for (4) 2019 MCI J4500 motor coaches (Bus #216, 217, 218, 219, VIN ending 9298, 9336, 9344, 9345) (Court Doc. 61, 111).

(p) R.V. Winkler Enterprises, LLC – Rent for office and part of buildings at 2600 NE Adams St., Peoria, IL.

(q) Sumitomo Mitsui Finance and Leasing Co. – Lease for 2020 Van Hool CX45 motor coach (Bus #234, VIN ending 1540) (Court Doc. 62, 112) (Proof of Claim 6-1).

(r) TCF Equipment Finance a division of TCF National Bank / The Huntington Bank as successor – Leases for 2018 Van Hool CX35 motor coach (Bus #279, VIN ending 9650) and 2017 Van Hool CX45 motor coach (Bus #212, VIN ending 9373) (Court Doc. 63, 113) (Proof of Claim 14-1).

(s) VFS Leasing Co. – Leases for (2) 2023 Prevost H3-45 motor coaches (Bus # 238, 270, VIN ending 1361, 1362), (2) 2024 Prevost H3-45 motor coaches (Bus #208, 209, VIN ending 1609, 1610) (Court Doc. 65, 114) (Proof of Claim 2-1).

(t) VFS Leasing Co. / EverBank, N.A. as assignee – Lease for (1) 2024 Prevost H3-45 motor coach (Bus #214, VIN ending 1685) (Court Doc. 65, 114). (Proof of Claim 12-1).

(u) Wells Fargo Equipment Finance – Leases for (5) 2018 MCI 34500 Intercity Coaches (Bus # 227, 229, 230, 231, 232, VIN ending 8580, 8581, 8582, 8583, 8584, (1) 2017 Van Hool CX45 Bus (Bus #233, VIN ending 9443), (2) 2020 MCI J4500 motor coaches (Bus # 247, 269, VIN ending 9666, 9667), (2) 2018 MCI J4500 motor coaches (Bus # 205, 227, VIN ending 8940, 8941) (Court Doc. 66, 115) (Proof of Claim 3-1).

(v) Wells Fargo Equipment Finance / M&T Bank as assignee - (3) 2018 Van Hool CX45 buses (Bus # 225, 265, 268, VIN ending 9613, 9618, 9739) (Court Doc. 66, 115).

(w) Wells Fargo Equipment Finance / Flagstar as assignee – (1) 2019 Van Hool CX45 motor coach (Bus #203, VIN ending 1410), (1) 2020 Prevost H3-45 Highway Motor Coach (Bus #206, VIN ending 0807) (Court Doc. 66, 115).

9.2   All executory contracts and unexpired leases which exist between the Debtor and any other party, whether such executory contract be in writing or oral, which has not been previously assumed, assigned, rejected or otherwise terminated by the Debtor shall be deemed assumed as of the time of Confirmation of the Plan.

9.3   Proofs of Claims filed for executory contracts or unexpired leases that have been previously assumed or are assumed under this Plan shall be considered contingent and unliquidated and will not receive a ballot to vote on the Plan, as such executory contracts or unexpired leases are continuing to be performed. No separate distributions will be made on such lease claims under this Plan other than as provided for under the terms of the assumed executory contracts or unexpired leases.

## ARTICLE X
## RETENTION OF JURISDICTION

10.1   The Court shall retain jurisdiction after Confirmation to: (i) hear and determine applications for fees and allowances of professionals; (ii) supervise the implementation, interpretation or enforcement of this Plan; (iii) hear and determine objections to Claims filed in this Case; (iv) hear and determine applications for the assumption, assignment and/or rejection of executory contracts; (v) hear and determine all adversary proceedings or contested matters whether filed before or after Confirmation; (vi) resolve disputes regarding interpretation or enforcement of terms of the Plan; (vii) allow Administrative Claims and Tax Claims; (viii) enter orders for substantial consummation of the Plan; (ix) approve modification of the Plan as brought before the Court in accordance with Section 1193 of the Bankruptcy Code; (x) hear and determine all applications and motions pending before the Court on the date of Confirmation or such other matters as are commenced after Confirmation of the Plan; and (xi) enter any order, including injunctions, necessary to enforce title, rights and powers of the Debtor, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as may be necessary.

## ARTICLE XI
## LIENS AND DISCHARGE

11.1   The provisions of the confirmed Plan shall bind all creditors and other parties in interest, whether or not such persons or parties accept the Plan. The distributions provided under the Plan shall be in exchange for and in complete satisfaction and release of all liens and Claims against any of the assets of the Debtor and its Estate. Unless otherwise specifically provided to the contrary herein or in the Confirmation Order, on and after Confirmation, all holders of Claims shall be precluded from asserting any lien or Claim against the Debtor or its property other than as set forth in the Plan.

11.2   In the event the Plan is confirmed pursuant to Section 1191(a) of the Bankruptcy Code, the discharge provisions of Section 1141(d) of the Bankruptcy Code shall apply and, upon the Effective Date, the Debtor shall be entitled to a discharge of all debts as provided in Section 1141(d)(1)(A) of the Bankruptcy Code, except, if applicable, as provided in Section 1141(d)(6) or Section 523(a) of the Bankruptcy Code.

11

11.3     In the event that the Plan is confirmed pursuant to Section 1191(b) of the Bankruptcy Code, the Debtor will not receive a discharge upon the Effective Date and will instead seek entry of a discharge from the Court pursuant to Section 1192 of the Bankruptcy Code after all payments under the Plan are made. This discharge provision applies to all creditors and any person or party making any claim through any creditor.

## ARTICLE XII
## BINDING EFFECT OF PLAN

12.1     Upon the Effective Date, the provisions of this Plan are binding on all persons to the fullest extent permitted under applicable law. Except as expressly provided herein, the provisions of the Plan shall discharge the Debtor from all such Claims and obligations arising prior to the Effective Date.

12.2     The rights and obligations of any person or entity referred to in the Plan shall be binding upon, and shall inure to the benefit of the successors and assigns of any such person or entity.

12.3     Unless the order confirming the Plan is stayed pending appeal, the Debtor may consummate the Plan notwithstanding the pendency of an appeal from the Confirmation order.

12.4     Should any provision of the Plan be determined to be unenforceable, such determination shall not impair, limit or otherwise affect the enforceability of any other provision of this Plan.

## ARTICLE XIII
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

13.1     Except as otherwise ordered by the Court, the Debtor shall file any and all objections to the allowance of Claims by not later than thirty (30) days of Confirmation of the Plan unless extended by an order of the Court.

13.2     No distribution shall be made to the holder of Claims to which an objection is filed until the dispute is resolved either by agreement or by an order of the Court. Except as provided in the Plan, distributions to holders of Allowed Claims shall not be held back pending resolution of Claims that are disputed. However, in the event a distribution is made to the holders of Allowed Claims in a given Class of Claims under the Plan before all disputed Claims in such Class have been resolved, sufficient funds shall be held back to pay the Pro Rata share due to the holders of the disputed Claims in such Class in the event the dispute is resolved against the Debtor.

13.3     In the event that any distribution is made to an Allowed Claim by the Debtor or Trustee under this Plan and remains unclaimed ninety (90) days after such distribution is made, this Debtor or Trustee shall follow the provisions of 11 U.S.C. § 347. The Debtor or Trustee shall stop payment on any check remaining unpaid and pay such amounts into the court as provided for in 11 U.S.C. § 347.

12

## ARTICLE XIV
## RETENTION OF CAUSES OF ACTION

14.1    The Debtor shall retain any and all claims and causes of action it has against third parties. Such claims and causes of action shall survive and be unaffected by Confirmation of the Plan. Any funds realized from such retained claims and causes of action prior to the final payment under the Plan within five (5) years shall be disclosed and turned over to creditors by the Debtor or Trustee for distribution to holders of Allowed Claims, unless otherwise agreed with the Debtor or Trustee, or determined by the Court.

## ARTICLE XV
## CONFIRMATION AND DISTRIBUTION PROCEDURE

15.1    In the event the holders of Impaired Claims vote to accept the Plan, the Debtor will seek to confirm the Plan pursuant to Section 1191(a) of the Bankruptcy Code.

15.2    If the Plan is confirmed pursuant to Section 1191(a) of the Bankruptcy Code, the Debtor will be the disbursing agent to the holder of the Class 3 Secured Claim and Class 4 General Unsecured Claims. The Debtor will make distributions on allowed amounts of the holders of the Class 4 General Unsecured Claims without interest by Pro Rata payments through an annual distribution of $21,629 for the five (5) years after the Effective Date. The first annual payment shall be due one (1) year after the Effective Date.

15.3    If the Plan is confirmed pursuant to Section 1191(a) of the Bankruptcy Code, property of the Estate will revest in the Debtor upon the Effective Date.

15.4    In the event the holders of Impaired Claims do not vote to accept the Plan, the Debtor may seek to confirm the Plan pursuant to Section 1191(b) of the Bankruptcy Code.

15.5    If the Plan is confirmed under Section 1191(b) of the Bankruptcy Code, assets of the Estate will not revest in the Debtor until completion of the payments under the Plan or order of the Bankruptcy Court. The Debtor shall pay all allowed Administrative Claims and Tax Claims, and disburse monthly to the holder of the Class 3 Secured Claim.

15.6    If the Plan is confirmed under Section 1191(b) of the Bankruptcy Code, the Debtor shall continue to be the disbursing agent to the holder of the Class 3 Secured Claim, and any Administrative Claims and Tax Claims, but the Trustee shall be the disbursing agent for the payments to any allowed Class 4 General Unsecured Claims. Solely as an accommodation to Dayspring in this case, the Debtor agrees to provide to Dayspring a copy of its annual tax return after it is filed, and an annual balance sheet and statement of income and expenses. At the time the amounts to be paid under this Plan to Class 4 General Unsecured Claims are paid in full, any such further annual informational reporting by the provision of tax returns or other statements shall cease. The Trustee shall make distributions on allowed amounts of the holders of Class 4 General Unsecured Claims without interest by Pro Rata payments through an annual distribution of $21,629 for the five (5) years after the Effective Date. The first annual payment shall be due one (1) year after the Effective Date.

13

## ARTICLE XVI
## REQUEST FOR CONFIRMATION

16.1    The Debtor believes that confirmation and implementation of this Plan is preferable to dismissal of the Case or conversion of the Case to Chapter 7 because by allowing the Debtor to continue to operate and generate income for payment of Allowed Claims, it will avoid the costs and expenses necessary to pay Allowed Claims and provide more recovery to creditors than if the Estate were liquidated. The Debtor therefore urges all creditors to accept this Plan and to evidence such acceptance by returning their Ballots to the undersigned on or before the date listed on the Ballot.

PEORIA CHARTER COACH COMPANY

Dated: June 8, 2026

/s/ Jeana Kim Reinbold
By: One of its attorneys
Sgro, Hanrahan, Durr, Rabin & Reinbold, LLP
1119 S. 6th Street
Springfield, IL 6203
(217) 789-1200
jeana@casevista.com

**EXHIBIT A**
**LIQUIDATION ANALYSIS**

In re Peoria Charter Coach Company
Chapter 11 (Subchapter V) - Case No. 25-80900

| Asset | Value | Secured Claims | Liquidation Costs | Liquidation Value |
|---|---|---|---|---|
| Morton Community Bank account ending in 3257 | $25,000 | $190,000 (Morton)<br><br>$3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| Morton Community Bank account ending in 3858 | $843,168.09 | $190,000 (Morton)<br><br>$3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| Morton Community Bank account ending in 0280 | $190,166.75 | $190,000 (Morton)<br><br>$3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| Prepaid expenses (building, workers comp, health and auto insurance) | $195,193 | | Would be liquidated in c.7 because subject to claims for prepayments. | $0 |
| Accounts Receivable | $160,601 | $190,000 (Morton)<br><br>$3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| Osaic brokerage account ending in 0722 | $408,659 | $190,000 (Morton)<br><br>$3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| Parts on hand in Peoria including fuel and diesel exhaust fluid | $50,000 | $190,000 (Morton)<br><br>$3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| Parts on hand in Urbana including fuel and diesel exhaust fluid | $10,000 | $190,000 (Morton)<br><br>$3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| Office furniture and equipment | $4,250 | $190,000 (Morton)<br><br>$3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| 2007 GMC Shop Truck (VIN ending 6495 Mileage: 123,682) | $2,000 | | | $2,000 |
| 2001 Dodge Shop Truck (C-U, VIN ending 3035, Mileage: 54,538) | $1,000 | | | $1,000 |
| 2018 Ford Service Truck (VIN ending 2741, Mileage: 27,804) (Dayspring holds title) | $10,000 | $3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |

Exhibit A - 1

| | | | | |
|---|---|---|---|---|
| 2018 Dodge Gray Van (#2, VIN ending 8990, Mileage: 273,388) | $1,000 | | | $1,000 |
| 2016 Dodge Granite Van (#4A, VIN ending 5397, Mileage: 293,700) (Dayspring holds title) | $995 | $3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| 2016 Dodge Granite Van (#10A, VIN ending 1664, Mileage: 255,344) (Dayspring holds title) | $1,074 | $3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| 2017 Dodge White Van (#6, VIN ending 2613, Mileage: 213,758) | $1,000 | | | $1,000 |
| 2015 Silver Van (#12, VIN ending 5627, Mileage: 268,620) | $500 | | | $500 |
| 2010 Ford White Van (#20, VIN ending 7402, Mileage: 305,704) | $500 | | | $500 |
| 2010 Silver White Van (#21, VIN ending 8112, Mileage: 262,989) | $500 | | | $500 |
| 2010 Ford White Van (#22, VIN ending 1517, Mileage: 268,599) | $800 | | | $800 |
| 2012 Ford White Van (#23, VIN ending 1538, Mileage: 261,304) | $500 | | | $500 |
| 2017 Ford Transit (#24A, VIN ending 5287, Mileage: 241,628) (Dayspring holds title) | $10,000 | $3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| 2019 Chrysler Pacifica (#26A, VIN ending 2132, Mileage: 106,392) | $10,000 | | | $10,000 |
| 2020 Chrysler Pacifica (#27A, VIN ending 5997, Mileage: 133,753) | $10,000 | | | $10,000 |
| 2020 Chrysler Pacifica (#28A, VIN ending 5605, Mileage: 133,540 | $10,000 | | | $10,000 |
| 2019 Chrysler Pacifica (#29A, VIN ending 7925, Mileage: 80,622) | $10,000 | | | $10,000 |
| 2022 Chrysler Pacifica (#30A, VIN ending 8432, Mileage: 63,743) | $12,000 | | | $12,000 |
| 1947 GMC Motor Coach (antique plates) | $15,000 | | | $15,000 |
| 1971 Trailer | $200 | | | $200 |
| 2019 Van Hool Motor Coach CX45 (#203, VIN ending 1419) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2019 Van Hool Motor Coach CX45 with 431,635 miles (#204, VIN ending 9100) | $45,000 | | | $45,000 |
| 2018 MCI Motor Coach J4500 (#205, VIN ending 8940) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |

Exhibit A - 2

| | | | | |
|---|---|---|---|---|
| (subject to lease of Wells Fargo Equipment Finance) | | | | |
| 2020 Prevost Motor Coach H3-45 (#206, VIN ending 0807) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2023 Van Hool Motor Coach CX45 (#207, VIN ending 4113) (subject to lease of Old Second National Bank) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2024 Prevost Motor Coach H3-45 (#208, VIN ending 1609) (subject to lease of VFS Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2024 Prevost Motor Coach H3-45 (#209, VIN ending 1610) (subject to lease of VFS Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2024 MCI Motor Coach J4500 (#210, VIN ending 7670) (subject to lease of Customers Commercial Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2024 MCI Motor Coach J4500 (#211, VIN ending 7671) (subject to lease of Atlantic Union Equipment Finance)[1] | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2017 Van Hool Motor Coach CX45 (#212, VIN ending 9373) (subject to lease of TCF Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2024 Prevost Motor Coach H3-45 (#214, VIN ending 1885) (subject to lease of VFS Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2016 Van Hool Motor Coach CX45 with 603,601 miles (#215, VIN ending 8946) | $40,000 | | | $40,000 |
| 2019 MCI Motor Coach J4500 (#216, VIN ending 9298) (subject to lease of People's Capital and Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2019 MCI Motor Coach J4500 (#217, VIN ending 9336) (subject to lease of People's Capital and Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2019 MCI Motor Coach J4500 (#218, VIN ending 9344) (subject to lease of People's Capital and Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2019 MCI Motor Coach J4500 (#219, VIN ending 9345) (subject to lease of People's Capital and Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2024 Van Hool Motor Coach CX45 (#220, VIN ending 4245) (subject to lease of ABC Companies) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |

[1] The year and lienholder for Bus 211 is corrected from what was in the motion to assume and listed in Schedule AB. See also footnote 2, supra Article IX, 9.1(d).

Exhibit A - 3

| | | | | |
|---|---|---|---|---|
| 2023 Mercedes-Benz Motor Coach Tourrider (#221, VIN ending 1976) (subject to lease of Ascentium Capital) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2023 Mercedes-Benz Motor Coach Tourrider (#222, VIN ending 1977) (subject to lease of Bank of America Leasing & Capital) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2024 Van Hool Motor Coach CX45 (#223, VIN ending 4284) (subject to lease of Midland States Bank) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 Van Hool Motor Coach CX45 (#225, VIN ending 9613) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 Van Hool Motor Coach CX35 (#226, VIN ending 9818) (subject to lease of ABC Companies) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 MCI Motor Coach J4500 (#227, VIN ending 8941) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 MCI Motor Coach J4500 (#228, VIN ending 8580) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 MCI Motor Coach J4500 (#229, VIN ending 8581) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 MCI Motor Coach J4500 (#230, VIN ending 8582) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 MCI Motor Coach J4500 (#231, VIN ending 8583) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 MCI Motor Coach J4500 (#232, VIN ending 8584) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2017 Van Hool Motor Coach CX45 (#233, VIN ending 9443) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2020 Van Hool Motor Coach CX45 (#234, VIN ending 1540) (subject to lease of Sumitomo Mitsui Finance and Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2016 MCI Motor Coach J4500 with 641,364 miles (#235, VIN ending 7415) (Dayspring holds title) | $50,000 | $3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| 2016 MCI Motor Coach J4500 with 652,444 miles (#237, VIN ending 7416) (Dayspring holds title) | $50,000 | $3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |

Exhibit A - 4

| Description | | | | |
|---|---|---|---|---|
| 2023 Prevost Motor Coach H3-45 (#238, VIN ending 1361) (subject to lease of VFS Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2013 MCI Motor Coach J4500 with 775,720 miles (#241, VIN ending 6518) | $30,000 | | | $30,000 |
| 2013 MCI Motor Coach J4500 with 755,115 miles (#242, VIN ending 6519) | $30,000 | | | $30,000 |
| 2007 MCI Motor Coach J4500 with 366,410 miles (#244, VIN ending 4262) (Coach is not in working condition and has been out of service for over half a year) (Dayspring holds title) | $10,000 | $3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| 2020 MCI Motor Coach J4500 (#247, VIN ending 9666) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2009 MCI Motor Coach J4500 with 873,555 miles (#249, VIN ending 5242) (Coach is not in working condition and has been out of service for over half a year) (Dayspring holds title) | $10,000 | $3,154,727 (Dayspring) | Would not be sold in c.7 because liens exceed value. | $0 |
| 2017 MCI Motor Coach J4500 with 308,344 miles (#254, VIN ending 7929) (Coach does not have a working AC system and has not been in service for over a year) (Dayspring holds title) | $20,000 | $3,154,727 (Dayspring) | Would not be liquidated in c.7 because liens exceed value. | $0 |
| 2018 Van Hool Motor Coach CX45 (#265, VIN ending 9618) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 Van Hool Motor Coach CX45 (#268, VIN ending 9739) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2020 MCI Motor Coach J4500 (#269, VIN ending 9667) (subject to lease of Wells Fargo Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2023 Prevost Motor Coach H3-45 (#270, VIN ending 1362) (subject to lease of VFS Leasing) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2018 Van Hool Motor Coach CX35 (#279, VIN ending 9850) (subject to lease of TCF Equipment Finance) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |
| 2020 MCI Motor Coach J4500 (#280, VIN ending 9695) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed vehicle value. | $0 |

Exhibit A - 5

| | | | | |
|---|---|---|---|---|
| (subject to lease of Atlys Commercial Credit)[2] | | | | |
| Garage tools: AC refrigerant recharging machine in Peoria (200), AC refrigerant recharging machine in Urbana garage (1000), bus lifts in Peoria (1000), bus lifts red in CU (1000), bus lifts white in CU (1000), tire changer in Peoria (800), tire changer in CU (800) | | | | $5,800 |
| 2006 MCI J4500 (old #207, VIN ending in 3740) (bus is in pieces and dismantled, setting in the back of lot; put out of service during COVID due to rusting and unsafe condition) (Dayspring holds title) | $0 | $3,154,727 (Dayspring) | Would not be sold in c.7 because costs and liens exceed value. | $0 |
| 54 exterior cameras, interior cameras, rear view cameras, wireless gear, 4Channel HD Solutions live video & GPA, software solution to live stream video; 270 indoor/outdoor cameras (subject to leases of Navitas Credit Corp. or assignees) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed value | $0 |
| Leasehold interest in office at 6035 N. Knoxville, Peoria (see Schedule G, 2.1), office at 191 N. Federal Drive Urbana, garage at 2008 N. Federal Drive, Urbana, company headquarters at 2600 NE Adams St., Peoria, IL (see Schedule G, 2.7 and 2.15), 1503 E. College Ave., Normal (see Schedule G, 2.9) | | | Would not be liquidated in c.7 due to leasehold interest and residual believed to exceed value | $0 |
| 12.5% interest in Unifleet software that company uses to operate (based on owners' assessment of what the software would be worth) | $2,125 | | Would not be liquidated in c.7 because costs of liquidation would exceed value. | $0 |
| Fuel Tax Refund | $27,481 | | | $27,481 |
| Term Life Insurance – Fort Dearborn | $0 | | | $0 |
| Insurance claim (McGarry) | Unknown | | | Unknown |
| | | | | |
| | | | Subtotal: | $289,281 |
| | | | | |
| | | | c.7 trustee commission: | ($17,714) |
| | | | Liquidation costs: | ($163,422) |
| | | | | |
| | | | Liquidation value | $108,145 |

[2]Bus 280 that is subject to the lease of Atlys Commercial Credit was inadvertently switched with Bus 211 in Schedule AB.

Exhibit A - 6

**Peoria Charter Coach Company**

**Case No. 25-80900**

**Exhibit B**

**FY26 Projection of Income and Expenses**

| | Jan. (ACTUAL) | Feb. (ACTUAL) | Mar. | Apr. | May | Jun. | Jul. | Aug. | Sep. | Oct. | Nov. | Dec. | YEAR TO DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INCOME | $1,089,000 | $1,340,000 | $1,700,000 | $1,367,000 | $1,602,000 | $1,249,000 | $1,029,000 | $1,089,000 | $1,524,000 | $2,056,000 | $1,619,000 | $1,193,000 | $16,857,000 |
| | | | | | | | | | | | | | |
| EXPENSES | | | | | | | | | | | | | |
| Payroll | $455,000 | $390,000 | $541,000 | $444,000 | $490,000 | $487,000 | $439,000 | $513,000 | $497,000 | $630,000 | $498,000 | $466,000 | $5,850,000 |
| Repairs to Revenue Equipment | $25,000 | $23,000 | $8,000 | $33,000 | $28,000 | $14,000 | $39,000 | $31,000 | $26,000 | $41,000 | $53,000 | $10,000 | $331,000 |
| Tires | $10,000 | $8,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $128,000 |
| Utilities/Phone | $10,000 | $11,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $121,000 |
| Equipment Rental (3rd party chartering buses) | $117,000 | $31,000 | $224,000 | $0 | $48,000 | $6,000 | $0 | $37,000 | $32,000 | $98,000 | $339,000 | $90,000 | $1,022,000 |
| Fuel/Oil | $83,000 | $88,000 | $140,000 | $119,000 | $119,000 | $117,000 | $111,000 | $92,000 | $117,000 | $145,000 | $139,000 | $97,000 | $1,367,000 |
| Driver Per Diem Expenses | $7,000 | $9,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $216,000 |
| Insurance | $96,000 | $112,000 | $120,000 | $146,000 | $146,000 | $146,000 | $146,000 | $146,000 | $146,000 | $146,000 | $146,000 | $146,000 | $1,642,000 |
| Rent Expense-Buildings | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $120,000 |
| Peoria Charter Travel Rent Expense (Peoria) | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $36,000 |
| Peoria Charer Travel Rent Expense (Normal) | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $24,000 |
| Peoria Office Rent | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $72,000 |
| Office Supplies, Postage | $1,000 | $1,000 | $4,000 | $4,000 | $4,000 | $5,200 | $5,800 | $6,400 | $7,000 | $7,600 | $8,200 | $8,800 | $63,000 |
| Internet | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $24,000 |
| Credit Card Fees | $36,000 | $35,000 | $37,000 | $42,000 | $28,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $388,000 |
| Payroll Taxes | $93,000 | $78,000 | $75,000 | $32,000 | $45,000 | $58,000 | $42,000 | $41,000 | $37,000 | $47,000 | $37,000 | $35,000 | $620,000 |
| Employee Welfare Expenses | $35,000 | $29,000 | $41,000 | $44,000 | $41,000 | $75,000 | $71,000 | $102,000 | $83,000 | $79,000 | $87,000 | $75,000 | $762,000 |
| Motorcoach Leases | $226,000 | $190,000 | $226,000 | $226,000 | $226,000 | $226,000 | $226,000 | $246,000 | $246,000 | $246,000 | $246,000 | $246,000 | $2,776,000 |
| Transportation Expenses (Lodging, e-logs, cameras, etc.) | $56,000 | $59,000 | $33,000 | $25,000 | $35,000 | $46,000 | $61,000 | $42,000 | $42,000 | $41,000 | $45,000 | $56,000 | $541,000 |
| | | | | | | | | | | | | | |
| Capitalized Parts | $0 | $0 | $21,000 | $21,000 | $21,000 | $21,000 | $21,000 | $21,000 | $21,000 | $21,000 | $21,000 | $21,000 | $210,000 |
| Bus Purchases | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $200,000 | $0 | $0 | $0 | $0 | $200,000 |
| Van Leases | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $15,000 |
| Future Building & Equipment Maintenance | $0 | $0 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $70,000 |
| | | | | | | | | | | | | | |
| SUBTOTAL EXPENSES | $1,273,000 | $1,087,000 | $1,541,000 | $1,207,000 | $1,302,000 | $1,302,200 | $1,262,800 | $1,581,400 | $1,358,000 | $1,605,600 | $1,723,200 | $1,354,800 | $16,598,000 |
| | | | | | | | | | | | | | |
| Secured Plan Payments - Dayspring | $14,528 | $14,528 | $14,528 | $14,528 | $14,528 | $14,528 | $14,528 | $14,528 | $14,528 | $14,528 | $14,528 | $14,528 | $174,335 |
| Taxes | $5,053 | $5,053 | $5,053 | $5,053 | $5,053 | $5,053 | $5,053 | $5,053 | $5,053 | $5,053 | $5,053 | $5,053 | $60,636 |
| Legal / Trustee Fees | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $2,400 |
| | | | | | | | | | | | | | |
| TOTAL EXPENSES | $1,292,781 | $1,106,781 | $1,560,781 | $1,226,781 | $1,321,781 | $1,321,981 | $1,282,581 | $1,601,181 | $1,377,781 | $1,625,381 | $1,742,981 | $1,374,581 | $16,835,371 |
| | | | | | | | | | | | | | |
| CASH FLOW | -$203,781 | $233,219 | $139,219 | $140,219 | $280,219 | -$72,981 | -$253,581 | -$512,181 | $146,219 | $430,619 | -$123,981 | -$181,581 | $21,629 |